## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **STEVEN LEDFORD, et al.** | : | **Case No: C-1-01-469** |
| **1086 Pennington Court Apt # 1** | | |
| **Cincinnati, Ohio 45240** | : | **(Judge Dlott)** |
| | | |
| **Plaintiff,** | : | |
| | | **CITY OF CINCINNATI** |
| **Vs.** | | **ET AL.'S MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| **CITY OF CINCINNATI, ET AL.** | | |
| **801 Plum Street** | | |
| **Cincinnati, Ohio 45202** | : | |
| | | |
| **Defendant.** | : | |

Now comes the City of Cincinnati, et al. by and through counsel and respectfully request this Honorable Court for an order granting summary judgment in their favor pursuant to Fed. R. Civ. Pro. 56. Defendants are entitled to summary judgment on the grounds that there are no genuine issues of material fact and the Defendants are entitled to summary judgment as a matter of law. A Memorandum in support of this motion is set forth below.

Respectfully submitted,

Julia McNeil
City Solicitor

/s/Thomas J. Harris
Thomas J. Harris III (0065946)
Assistant City Solicitor
City of Cincinnati
Room 214, City Hall
Cincinnati, Ohio 45202
(513) 352-3321
Fax: (513)352-1515
Email: tom.harris@cincinnati-oh.gov

# MEMORANDUM IN SUPPORT

**I.    Facts**

On July 22, 2000 at or near 3:00 a.m. Police Officer Donald Elsaesser was responding to the Walnut Hills area to assist other officers in search of a fleeing suspect from a stolen car. (Elsaesser deposition. Pg.7). Officer Elsaesser received a general description of the suspect from a radio dispatch call. (Elsaesser deposition. Pg.8). The general description was for a black male between 18-20 years old, 5' 8', 150 pounds wearing a black shirt and gray shorts. (Elsaesser deposition. Pg.). The area where the Officers believed the suspect fled is known as a high crime area. (Elsaesser deposition. Pg. 48; Ledford deposition. Pg. 38). While traveling to the general area of the assistance call, Officer Elsaesser saw Plaintiff run behind a building on Lincoln Avenue. (Elsaesser deposition. Pg. 49). After witnessing Plaintiff run behind the building, Officer Elsaesser directed the spotlight attached to his vehicle to the backside of the building were Plaintiff ran. (Elsaesser deposition. Pg. 35). While shinning the light, Officer Elsaesser saw Plaintiff peer around the building. (Elsaesser deposition. Pg.35). Officer Elsaesser thereafter directed Plaintiff to come from around the back of the building. (Elsaesser deposition. Pg.35). Plaintiff failed to follow Officer Elsaesser's orders. He instead ducked behind the other side of the building. (Elsaesser Deposition. Pg. 35). Officer Elsaesser directed the spotlight to the other side of the building and saw Plaintiff once again peer out from behind the building. (Elsaesser deposition. Pg. 35). Officer Elsaesser again directed the spotlight on Plaintiff and again directed him to come from the back of the building. (Elsaesser deposition. Pg. 35). Plaintiff again failed to comply with the Officer's request and ran from the area. (Elsaesser deposition. Pg 35.).

The back of the building were Plaintiff ran was not well lit. (Elsaesser deposition. Pg. 37). It was a dark debris and rock filled empty lot surrounded by a large number of tall grass and bushes. (Elsaesser Deposition. Pg. 37). While running through this grassy area and after getting to the lot, Plaintiff fell to

the ground. (Elsaesser Deposition. Pg. 37; Hankerson deposition. Pg. 47). Officer Hankerson, a fellow

officer that responded to the assistance call, saw Plaintiff fall and immediately tried to apprehend him.

(Hankerson deposition. Pg. 47). While trying to apprehend Plaintiff, a struggle ensued and Plaintiff

resisted arrest. (Hankerson deposition. Pg. 48). Plaintiff was maced, handcuffed and subsequently

charged with Obstructing Official Business and Resisting Arrest. (Elsaesser deposition. Pg. 55).

## II. STANDARD OF REVIEW

According to Fed. R. Civ. Pro. 56. summary judgment is appropriate when there is no genuine

issue of material fact for trial, and the moving party is entitled to judgment as a matter of law. In

deciding a motion for summary judgment, the court must view the evidence and draw all reasonable

inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 474

U.S. 574, 587 (1986),* The judge is not to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 249

(1986).* A genuine issue for trial exists when there is sufficient "evidence on which the jury could

reasonably find for the plaintiff." *Id. at 252.* Because no genuine issue of material fact exits in this case,

summary judgment must be granted in favor of the City of Cincinnati et al. for the various alleged 42

U.S.C. Section 1983 violations and the other pendent state law claims.

## III. ARGUMENT

### Defendants are entitled to qualified immunity.

For purposes of qualified immunity analysis, "Government officials who perform discretionary

functions are generally entitled to qualified immunity and are protected from civil damages so long as

their conduct does not violate a clearly established statutory or constitutional right of which a reasonable

person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).* Accordingly, it is first

important to determine if the individual has alleged a violation of a clearly established constitutional

right. *Dickerson v. McClellan, 101 F.3d 1151, 1158 (6th Cir.1996).* The court thereafter must then

discern whether or not a violation of this right has occurred and whether or not "the plaintiff has alleged

sufficient facts supported by sufficient evidence to indicate that what the official did was objectively

unreasonable in light of the clearly established constitutional rights. *Id.*

**A. Officer Elsasser did not violate a clearly established constitutional right.**

**1. Officer Elsaseer had probable cause to arrest.**

According to established law, Officers acting under color of state law cannot arrest a person

without probable cause. *Monroe v. Pape, 81 S.Ct. 473 (1961).* Probable cause has been defined as "a

reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.

*United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).* Moreover, probable cause exists if there can

be determined that there was a "fair probability" at the time of the arrest that the person arrested

committed an offense. *Sherwood v. Muldihill, 113 F.3d 396, (3rd Cir. 1997).* This standard is established

if the facts within the arresting officers knowledge would lead a reasonable officer in the same or similar

situation to determine that a crime has been or is being committed by the person arrested. *Orsatti v. New

Jersey State Police, 71 F.3d 482 (3rd Cir. 1995).*

To be sure, Plaintiff's actions on July 22, 2000, at 3:00 a.m. gave Officer Elsaesser

reasonable suspicion and probable cause to stop and arrest Plaintiff. To illustrate this point, during

Officer Elsaesser's deposition, he stated that:

> …When I first observed him, when he took
> off running from the crowd, that raised my suspicion.
> Did I go try to stop him at that point, no I wanted to
> see where he was going cause I had—I never got a
> real good look at him. He was such a distance from
> me that I could not tell is this the person, you know,
> what's going on here, so I drove down the street, okay
> I turned around, I tried to find the subject that took off
> from the rest of the crowd which to me was suspicious.
> When I seen movement in the back, I came back around

> to Lincoln, I see a head pop out. At that point, I felt that that
> suspicion is risen, maybe this is the subject that we're looking
> for, that's why I asked him to step out from behind the building.
> I don't know what he has, I don't know if this is the subject,
> I don't know what it is, but I asked him "Sir, I need to talk,
> you need to step out here." At that point he heard what I
> said and fled. (Elsaesser deposition. Pg. 49).

After being asked more directly by Plaintiff's counsel during the deposition why Plaintiff was

placed under arrest, Officer Elsaesser stated the following:

> Like I said, I attempted to do a, conduct a Terry stop to find out
> if Mr. Ledford was in fact the subject that bailed from the motor
> vehicle. I could not see him from the vantage point that I had
> from my initial contact. When I talked to him from behind the
> building he fled from me, at that point fleeing through the backyards.
> I had every right to stop him and ask him—if he had stopped, came
> out and it was determined, I wouldn't even have had to handcuff
> him. If he stopped, just talked to me, sir, thank you very much
> for your cooperation, you're not the subject we're looking for,
> we are looking for somebody different, but since we were
> already conducting an investigation from somebody that bailed
> from a motor vehicle I tried to conduct that Terry stop which
> pulled and he fled from it which first off it breaks up the first
> investigation from the person that bailed from the motor vehicle
> because that person actually eventually ended up getting away.
> Everybody else ended up being directed toward this person actively
> Fleeing... Secondly, if he had just stopped and talked to us for a
> second, none of this would have ever had to happen. An actual
> investigation was starting, beginning to be conducted and he fled
> from it and that's what he was arrested for.
> (Elsaesser deposition. Pg. 49).

As noted, Plaintiff was arrested for Obstructing Official Business. Juxtaposing the facts of the

case at bar and the reasons Officer Elsaesser articulated concerning his decision to stop and

subsequently arrest Plaintiff with the elements of the crime of Obstructing Official Business, a violation

of O.R.C. 2921.31(A), it is clear that Officer Elsaesser had probable cause to arrest Plaintiff. O.R.C.

2921.31(A) states that:

> No person, without privilege to do so and with purpose to prevent,
> obstruct, or delay the performance by a public official of any authorized
> act within the public officials capacity shall do any act that hampers or
> impedes a public official in the performance of the public official's lawful
> duties.

Plaintiff does not dispute the facts as stated above by Officer Elsaesser. In fact, during his deposition, Plaintiff admitted that he was committing a criminal act behind the building when Officer Elsaesser saw him and that this was the reason he would not come out from behind the building when directed to do so by Officer Elsaesser. That was also the reason he tried to hide from Officer Elsaesser after the spotlight was directed towards him. Specifically, during Plaintiff's deposition, he stated that:

> And so when I was walking back to the car then I had
> to use the bathroom and so I says, you know I'm looking
> around like, you know, where can I run at and use the
> bathroom. So I **ran** behind a building there on the corner
> across from the Motorcycle Club to use the bathroom,
> and when I used the bathroom I looked around the corner
> and the Officer was shinning his spotlight down the side of the
> building, then I said he, you know, he caught me using the
> bathroom. So, and so I turned around to go around to the
> other side. The Officer I thinks backs up, and then all of a
> sudden I go to walk back around from the building and then
> it's like cops come from, come from all directions, like just
> bum rush me, you know. (Ledford deposition. Pg. 31).

Plaintiff went on further to state during the deposition after being asked a series of questions that:

> Q. Okay. And at some point while you were using the bathroom back
>
> there you spotted an officer or did an officer spot you?
>
> Mr. Helbling: Objection, calls for speculation, but answer what you know.
>
> A.  I assume he spotted me because he was you know, at the corner of the building
>
> shining the spotlight.
>
> Q. And you were nervous about that because you were in the act of doing what you were
>
> doing, correct?

A. Correct.

Q. Okay. And I guess when you saw that, you stopped and walked away from or left where you were standing doing what you were doing, right?

A. Right.

Q. Okay. And you went to the other side of the building at that point?

A. Yes sir.

Q. Okay. And what did you do at the other side of the building?

A. I went to the other side of the building and I think the officer backed up in the street shinning the spotlight back down the other side of the building….

Q. Okay. Now you said the officer was shinning the light on the other side of the building, are you talking about the other side of the building that you walked to; make sure I'm clear about what you're talking about. You walked from one side of the building---

A. To the other side.

Q. To another side of the building?

A. Right.

Q. Are you saying that the Officer flashed the light at that point at you on the other side of the building?

A.  Yes.

(Ledford deposition. Pgs. 35-36).

Later during the deposition, Plaintiff further stated the following after being asked a series of questions:

Q. And you were using the building behind the building to urinate, right?

A. Correct.

Q. And that's against the law, isn't it?

      Mr. Helbling: Objection. If you know. Relevancy too.

A   I don't know the law.

Q. I'm sorry, what?

A. I don't know.

Q. You don't know that it's illegal to do that?

A. Yes, I'm sure it is illegal to just urinate out anywhere.

Q. In public?

A. Yes, sir.

Q. And it was while you were urinating out there in public that this light flashed on you, is that right?

A. Yes, sir.

Q. And you knew it was a police officer because you saw him in uniform, didn't you?

(Ledford deposition pg. 85).

   In addition to agreeing that he ran behind the building to urinate in a public place and agreeing that it was illegal to do so, he also admitted that the general area in which he was stopped and subsequently arrested was not well lit and that the back of the building where he ran and was urinating is without any lights and is dark. (Ledford deposition pg. 39).  Moreover, Plaintiff also admitted during his deposition that the area where he was stopped and subsequently arrested was a high crime area. (Ledford deposition pg. 38). He further added that it was more of a high crime area at night than during the day. Specifically, Plaintiff stated after being asked a series of questions the following:

     Q. Okay. What part of town is Lincoln Avenue located?

A. It's Walnut Hills.

Q. Okay. Would you consider this area to be a low or high crime area, if you know?

    Mr. Helbling: Objection. Go ahead and answer.

A.  I would consider it high crime.

Q. Okay. And would you consider the area to be a low or high crime area more at night

or during the day?

    Mr. Helbling: Objection.

A.  At night.

Q. At night you say?

A Yes.

    Mr. Helbling: Move to strike.

(Ledford deposition. Pg. 38).

As noted, according to *Muldihill, 113 F.3d at 396,* probable cause exists if there can be determined that there was a "fair probability" at the time of the arrest that the facts within the arresting officers knowledge would lead a reasonable officer in the same or similar situation to determine that a crime has been or is being committed by the person arrested.  In the instant case, Officer Elsaesser was in the general area on an assistance call trying to find and apprehend a person that recently fled from a stolen car. (Elsaesser deposition pg. 7). The area where he was conducting the search for the fleeing suspect is a high crime area. (Ledford deposition. Pg. 38). While searching for the suspect, Officer Elsaesser saw Plaintiff run behind a building. (Elsaesser deposition. Pg. 49). Officer Elsaesser only got a quick glimpse of Plaintiff as he ran behind the building. (Elsaesser deposition. Pg. 49). The street is not well lit. (Ledford deposition pg. 39). It is dark behind the building where Plaintiff ran.(Elsaesser deposition. Pg. 37). More importantly than the above stated facts, Plaintiff admitted that he was

committing an illegal act—to wit urinating in a public place when Officer Elsaesser directed the spotlight towards him summoning Plaintiff from behind the building. (Ledford deposition. Pg. 85). Upon being discovered, Plaintiff tried to secret himself behind the building by ducking further into the shadows and moving to the opposite side of the building outside of Officer Elsaesser's view. (Ledford deposition. Pg. 35). To be sure, from the suspicious behavior displayed by Plaintiff as described by the undisputed facts above, it is clear that Officer Elsaesser had a legitimate reason to believe that Plaintiff may have been the fleeing suspect from the stolen car or that he was engaged in some other nefarious criminal activity.

Officer Elsaesser was conducting an investigation when he directed Plaintiff to come from the back of the building. (Elsaesser deposition. Pg. 49). He was trying to determine if Plaintiff was in fact the fleeing stolen car suspect he and other officers were looking for. (Elsaesser deposition. Pg. 49). His first step in the investigation was to talk with Plaintiff who he reasonably believed based on the aforementioned circumstances may have been the stolen car suspect he was in search of. Plaintiff, however, fled from Officer Elsaesser and tried to secret himself from view. (Elsaesser deposition. Pg. 49). In so doing, Plaintiff impeded Officer Elsaesser and the other Officer's attempts to locate the actual stolen car suspect they were all searching for when they were compelled to chase and subsequently arrest Plaintiff. For this reason, Office Elsaesser had probable cause to believe that Plaintiff obstructed his lawful and official business, to wit—trying to apprehend the actual fleeing stolen car suspect he was searching for. Moreover, Plaintiff's admission that he was in fact committing a criminal offense at the time Officer Elsaesser directed his light on him as he was urinating in a public place also forms the basis for Officer Elsaesser's probable cause to arrest Plaintiff.

**B. Officer Elsaesser's actions were not unreasonable**.

Assuming for purposes of argument this Court believes that Officer Elsaesser violated Plaintiff's clearly established constitutional rights. The second prong of the qualified immunity analysis requires the Court to determine if the actions taken by the Officer where objectively unreasonable. As noted previously herein, public officials are entitled to qualified immunity if the right alleged to be breached by the official was not established at the time of the offense or if established, the actions taken by the official were reasonable. *Anderson v. Creighton, 483 U.S. 635,640 (1987), Saucier v. Katz, 533 U.S. 194, 200-201 (2001).*

Officer Elsaesser's actions concerning the events of July 22, 2000, were not unreasonable. Two other Officers that were also searching for the fleeing stolen car suspect on July 22, 2000, stated during their respective depositions that Officer Elsaesser's actions were not unreasonable. Officer Kevin Hankerson, a seasoned Officer who perfected Plaintiff's arrest stated during his deposition after being asked a series of questions the following:

Q.   Okay.  If, as a police officer, you are responding to a radio run looking for a male black, 18 to 20 years old, and you see somebody not matching that description and they start to run from you, do you have a right to run after them and stop them?

MR. HARDIN:  Objection.  You may answer.  I'm objecting to the form of the Question, just so you understand.

A.   If  I'm in one of the high crime areas and someone took off running from me with a description and I would chase them?  I've done that.

Q.   That did not meet the description?

A.   That did not -- if I'm – and they took off bolting?

Q.   Someone not meeting the description --

11

A.   Yes, sir.  Yes, sir, I would chase them.

Q.   And why would you do that?

A.   A lot of times information given is not always accurate, and you've only seen

somewhat of a person, and you give out the best description that you can.  That would mean

that it was inaccurate at that point in time.

Q.   So, if a description was given for a male black, 18 to 20 years old, 5' foot 8'

inches tall, would you stop a white woman who was approximately 70 years old and 200

pounds?

MR. HARDIN:  Objection.  You may answer.

A.   No, sir, I wouldn't.

Q.   Okay.  Would you stop a male black, 205 pounds, 30 years old?

MR. HARDIN:  Objection.  You may answer.

A.  If he's close, yes, sir.

Q.   It's a subjective thing between an old white woman running away from you, a

heavy-set white woman and a 30-year-old male black?  Is it a subjective decision you're

making?

MR. HARDIN:  Wait a minute. Objection.  You may answer.

A.   Okay.  Well, the difference is, if you put out another white female in that area,

and I'm looking for one and that one happens to run, I would chase her.  I mean, a lot of

times when people take off running from you, you only get somewhat of a description.  I

mean, unless you're sitting right here in front of me and I can look at you up and down and

pretty much give you a good description, but if someone is running away from me, I have

to give what  I perceive at that time that person to be.  And if I went into that area and that

12

person took off running from me, I would chase that person.  I have done it.

Q.  So, you have to decide during a responding call, radio call, if the description

is inaccurate or not, or is there any way for you to try and verify that as you go into the

situation?

A.  Well, if I'm in a high crime area and the description was given out and someone

bolted, someone just -- I'm in the area searching and someone just took off and ran from

me, it would raise my suspicion of that person.

Q.  If you -- strike that.  Do you believe that if you are operating under a radio

run or response, and you have a question about the description at all, you have a right to

stop anybody and do a Terry-stop?

MR. HARDIN:  Objection.  You may answer.

A.  If someone -- if I have a radio run in that area, and we're looking for someone,

and I got close to the area where we're looking for someone and someone took off

running, I would stop them, yes.

Q.  You think you have a right to do that?

A.  Yes, sir.

Q.  Why?  Based upon what?

A.  Based upon the nature of the call, the suspicion of the run in the area that I'm in.

Q.  And you would do that based upon an incomplete description?

MR. HARDIN:  Objection.  You may answer.

A.  Yes, sir.  I would do it based upon what was given out.

Q.  Would there be any differentiation whether you knew it was a felony response, a

misdemeanor response or a traffic response?

MR. HARDIN:  Objection.

A.   No, sir.  It would just be based on it was the run being put out, the general

area and suspicion that was raised by the person that took off running when I came into

the area.

(Officer Hankerson deposition. Pgs. 29-35).

Officer Robert Williams, another Officer that arrived on the scene during Plaintiff's

arrest also testified that given the late hour, the fact that this is a high crime area and the fact that

Plaintiff ran when he saw Officer Elsaesser, that he too may have tried to stop Plaintiff. Specifically,

Officer Williams stated during his deposition after being asked a series of questions that:

Q. Okay. If he saw you and took off running, would you?

A.  If he saw me and took off running, I may have.

Q.  And why would you do that, again?

A.  Sometimes out there they will—especially if there has been a crime committed, suspects

will wear different clothes, a couple of shirts, to change their appearance as they are

running from the police. They may wear two or three shirts and take them off. We'll find

them as we're chasing. Canine a lot of times will say, "I found this shirt over here." So, it's

good if you have a description that you saw a white shirt underneath or a pink shirt, or

something like that, so you can give additional descriptions.

(Williams deposition. Pg 27).

Both Officer Williams and Officer Hankerson indicated that they may have done what Officer

Elsaesser did if confronted with the same situation of determining the identify of a fleeing suspect that

runs behind a building upon seeing a police Officer in a high crime area. Neither of the officers

concluded that Officer Elsaesser's actions were unjustified or objectively unreasonable. Each after being

asked the question by Plaintiff's counsel, concluded that they probably would have done what Officer

Elsaesser did based on the facts presented to Officer Elsaesser on the night of July 22, 2000. As such, it

cannot be said that Officer Elsaesser's actions on July 22, 2000 were objectively unreasonable. With that

being the case, even if the Court believes that Officer Elsaesser violated a clearly established

constitutional right afforded to Plaintiff, which the City of Cincinnati and Officer Elsaesser strongly

deny, it cannot be said that Officer Elsaesser does not satisfy the second prong of the qualified immunity

analysis, which requires a finding that what the officer did was objectively unreasonable.

**C.  City of Cincinnati Police Chief Thomas Streicher, John Shirey, Kent Ryan, Gregory**

      **Baker & the City of Cincinnati.**

Plaintiff in his complaint names City of Cincinnati Police Chief Thomas Streicher and a number

of current and former administrative officials employed by the City of Cincinnati as Defendants in the

Complaint. It appears from the Complaint that the action against the City of Cincinnati, Chief Streicher

and the other administrative defendant's is based upon a claim that the City of Cincinnati has a practice,

policy, procedure and custom of violating citizens rights and that the City of Cincinnati failed to train

and or properly supervise its employees.

The United States Supreme Court in *Monell v. Department of Social Services of the*

*City of New York, 436 U.S. 658 (1978),* ruled that governments can be sued directly under U.S.C. 42

Section 1983 were the alleged action of the government is officially implemented, adopted, ratified

or promulgated by those with official policy making authority or is a general unwritten custom or

practice. The Sixth Circuit Court of Appeals following the logic in *Monell*, *436 U.S. at 658*, stated in

*White v. Ficano, 20 Fed. Apex. 450; 2001 U.S. App. LEXIS 21286,* that:

> municipal entities cannot be held responsible for a constitutional
> deprivation unless there is a direct causal link between a municipal
> policy or custom and the alleged constitutional deprivation. *Deaton*
> *v. Montgomery County, Ohio,989 F.2d 885, 889 (6th Cir. 1993).*

> The plaintiff must identify the policy, connect the policy to the governmental entity, and show that the particular injury was incurred because of the execution of that policy in § 1983 actions to impute liability to municipalities. *See Garner v. Memphis Police Department, 8 F.3d 358, 363-64(6th Cir. 1993) See  Monell, 436 U.S. at 658.* Similarly, supervisory personnel are not liable under the doctrine of respondeat superior, rather, plaintiff must allege that a supervisor condoned, encouraged or knowingly acquiesced in the alleged misconduct. *See. Taylor v. Mich. Dep't of Corr. 69 F3d 76, 80-81(6th Cir. 1995).* Here, plaintiff identified no [governmental] policy or custom that might give rise to municipal liability and alleged no personal involvement by the defendant sheriff that might give rise to liability.

Plaintiff in the instant case cannot identify a specific policy, practice, custom or procedure adopted or ratified by the City of Cincinnati, which was a causal link to a violation of a constitutional right afforded to Plaintiff on July 22, 2000. Moreover, Plaintiff can neither show that Police Chief, Thomas Streicher or any City of Cincinnati administrative official condoned, encouraged or knowingly acquiesced in any malevolent or alleged misconduct of its officers in perfecting Plaintiff's arrest. All that Plaintiff alleges as it relates to Police Chief Streicher and the City of Cincinnati is that Chief Streicher is in a position of control and authority over the Officers. As mentioned, however, well established case law requires Plaintiff to establish a causal connection between a ratified policy or practice of the municipality or an action by a superior condoning or encouraging the alleged misconduct. Respondeat superior is not applicable to a municipality or its supervisors. For the above stated reasons, the City of Cincinnati, Chief Streicher, John Shirey, Kent Ryan and Gregory Baker should be granted summary judgment as a matter of law.

### D. Excessive Use of Force

According to *Graham v. Connor, 490 U.S. 386,(1989)*, all excessive use of force cases, deadly or not, in the course of an arrest of a citizen should be analyzed under the Fourth Amendment and its reasonableness standard.  In determining whether the force that was used by the arresting officer was necessary requires a careful balancing of the nature and quality of the intrusion of the individual's

Fourth Amendment interest against the countervailing governmental interest at stake. *Id at 396*. This analysis requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the subject imposes an immediate threat to the safety of the officers and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The reasonableness of a particular use of force by an officer must be assessed "from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Id.* This perspective allows "for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation." *Id at 396-397*. In short, the applicable standard a court must apply in determining whether an officer's actions in arresting an individual were excessive is an objective one. *Id.* The operative question, therefore is "whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

In Paragraph 17 of Plaintiff's Complaint, he alleges that he was tackled by unnamed police officers and "[o]nce in hand-cuffs, and without justification for additional force, Defendants Elsaesser and John Does 1-6 sprayed mace or chemical irritant into Plaintiff Steve Ledford's eyes causing severe pain." (Paragraph 17, Plaintiff's Complaint). During Plaintiff's deposition, Plaintiff did not attribute any excessive use of force against Officer Elsaesser at all. When asked during his deposition about Officer Elsaesser's involvement as it relates to excessive use of force, Plaintiff stated the following:

> Q. Officer Elsaesser sits here today, do you recall seeing him back there with you on that
>    night, this officer that's sitting next to me?
>
> A. I'm not a 100 percent sure, I mean as far as during the arrest?
>
> Q. Whatever, start from the arrest or before, whatever you remember?
>
> A. I remember Elsaesser was in the car, was, you know, when I was looking around the

building, I remember that part, and then after that I don't remember when he parked

the car and got out on feet, I don't remember that part, but I do remember him taking

my I.D. after I was handcuffed and ran it through, and the officers was in a huddle,

what I mean by "huddle" was in the little circle—

Q. Yes, sir.

(Ledford deposition. Pg. 42).

From the above passage, it is clear that any claims asserting excessive use of force against

Officer Elsaesser should be dismissed as no claims for excessive force have been asserted against

Officer Elsaesser.

**E. Failure to provide medical treatment.**

Plaintiff in his Complaint alleges that defendants failed to provide him medical care for the

alleged injuries he sustained during the arrest. The law concerning deliberate indifference as it relates to

medical treatment for prisoners and or pretrial detainees is clear. In *Estelle v. Gamble, 429 U.S. 97

(1976)*, the U.S. Supreme Court concluded that "[i]n order to state a cognizable claim, a prisoner must

allege acts or omissions sufficiently harmful to evidence deliberate indifference." *Id at 106.* Deliberate

indifference is not merely negligence. The standard requires defendants to know of and despite that

knowledge still disregard a substantial risk of serious harm and safety to the prisoner or pretrial detainee.

*Farmer v. Brennan 511 U.S. 825, 835-37 (1994).* It is not enough that there was a substantial risk that

defendants should have objectively been aware of. "The Official must both be aware of facts from which

the inference could be drawn that a substantial risk of serious harm exists and he must also draw the

inference." *Id. at 837.*

This two pronged deliberate indifference standard articulated in *Estelle, 429 U.S. at 97*, and *Farmer, 511 U.S. at 825*, was extended to pretrial detainees in *City of Revere v. Mass General Hospital, 463 U.S. 239 244 (1983), Horn v. Madison County Fiscal Ct., 22 F.3d 653, 660 (6th Cir.).*

**1. Objective Component**

According to *Farmer, 511 U.S. at 834*, to satisfy the objective component of the deliberate indifference two-pronged test, Plaintiff must provide evidence that he was detained "under conditions posing a substantial risk of serious harm." To determine if Plaintiff's claim for lack of reasonable medical treatment is "sufficiently serious, courts look to the effect of any delay in treatment caused by an officer's inaction." *Id.*

Specifically, a pretrial detainee that alleges a delay in providing medical treatment as a constitutional violation, must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed. *Vaughn v. City of Lebanon, 2001 U.S. App. Lexis 18935 (6th Cir.).* In short, Plaintiff is charged with the duty of putting in the record medical documents that show that a delay in treatment occasioned by the official's actions or inaction had a "discernable detrimental effect" on Plaintiff's health. *Id.*

In the instant case, Plaintiff indicated that he has no documentation that satisfy the above stated requirement. Specifically during Plaintiff's deposition, the following exchange took place:

Q. Was there something that the City of Cincinnati Police Officers did or do you have documentation from a doctor or from any medical provider that show that what the officer did in this case, the named officer in this case did or any officer in this case did which caused major injury to your knee or to your eye worse because they didn't provide medical attention for you?

Mr. Helbling: Do we have any documents that says that?

Mr. Harris: Any documentation?

19

Mr. Helbling: That says that?

Mr. Harris: The first question was whether or not he believes that they did anything that exasperated the situation and he said, no to that, and I'm asking do you have any documentation.

Mr. Helbling: That states that specifically.

A.  I don't have no documentation that states specifically. I have documentation where I have went to Good Sam and Dr. Wings.

(Ledford deposition. Pg. 71).

## 2. Subjective Component

In order to prove the subjective component of *Farmer*, it is necessary for Plaintiff to "present sufficient evidence that defendants acted with deliberate indifference or recklessness, that is more than mere negligence." *511 U.S. at 834, Sanderfer v. Nichols 62 F.3d 151,154 (6th Cir 1995), Daniel v. Young 2002 U.S. App. Lexis 22966 (6th Cir 2002).* Under this subjective prong of the *Farmer* test, Plaintiff must show that the officials acted or failed to act guided by a "sufficiently culpable state of mind." *511 U.S. at 834, Henry v. Michigan Department of Corrections, 2001 U.S. App. Lexis 27086 (6th Cir. 2001).*

From the record there is no evidence that any of the defendants acted with deliberate indifference or recklessness as it relates to providing medical care for the scrapes Plaintiff received on his knees after he fell and resisted arrest.  Plaintiff received medical attention from the City of Cincinnati Fire Department EMS at the scene of his arrest. When asked what he remembered about the treatment during his deposition, the following exchange took place:

Q. And you say you received treatment at the, in a chair or at the scene—

A. Right.

Q. --by the Fire Department?

A. Yes, sir.

Q. What treatment did you receive specifically from them?

A. I remember them washing my eyes out from being maced, and then they washed out

the little cuts and bruises that I had on my legs.

(Ledford deposition. Pg. 44).

The standard that Plaintiff must meet as it relates to this component of the *Farmer* test require

him to establish that the officials knew of a serious medical issue and deliberately failed to secure

medical care and or attention for him. *511 U.S. at 834.* It is not enough for Plaintiff to simply state that

the officials failed to provide medical attention for him. Under the subjective component of *Farmer*, it is

his burden to show that the officials knew that he was in need of medical care and despite that

knowledge failed intentionally or purposefully to secure said treatment within a reasonable amount of

time. *511 U.S. at 834.*  In this case, Plaintiff was provided medical attention from the City of Cincinnati

Fire Department EMS on the scene of his arrest.

Conclusion

For the above stated reasons, the named Defendants in this case are entitled to summary judgment

as a matter of law on all of the issues raised by Plaintiff as there are no genuine issues of material fact.

Respectfully submitted,
J. Rita McNeil
City Solicitor

/s/ Thomas J. Harris
Thomas J. Harris (0065946)
Assistant City Solicitor
Room 214, City Hall
Cincinnati, Ohio 45202
(513) 352-3321
Fax: (513) 352-1515
Email: tom.harris@cincinnati-oh.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Motion has been sent by regular U.S.

Mail to Mark Tillar, at 111 Rossmore Ave. Cincinnati, Ohio 45237, this [8th] day of August 2003.


/s/ Thomas J. Harris
Thomas J. Harris (0065946)